UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MATTHEW MURPHY, CADE
BEAUPARLANT, and M., a minor, by his
mother and natural guardian MARIANNE
SAVAGE on behalf of themselves and
those similarly situated,

        Plaintiffs,

        v.

JUUL LABS, INC.,

        Defendant.

Civil Action No. _____

## COMPLAINT AND DEMAND FOR JURY TRIAL

### *Nature of the Action*

1. Plaintiffs MATTHEW MURPHY, CADE BEAUPARLANT, and M., a minor, by his

   mother and natural guardian MARIANNE SAVAGE (collectively "Plaintiffs") bring

   this class action individually and on behalf of all similarly situated persons ("Class

   Members") who purchased and became daily users of Juul e-cigarettes that were

   designed, manufactured, distributed, marketed, and sold by Defendant, JUUL Labs,

   Inc. ("Juul" or "Defendant"), and the parents and legal guardians of such persons.

   Plaintiffs bring this action for injunctive relief arising out of their injuries caused by

Defendant's wrongful conduct. Defendant's unfair and deceptive trade practices misled Class Members into use of its highly addictive e-cigarette products.

2.  During the time Plaintiffs used Juul e-cigarettes, they were designed, tested, manufactured, marketed, promoted, distributed, and sold by Defendant. Juul e-cigarettes were defective and unreasonably dangerous and should not have been sold to Plaintiffs at any time.

3.  During the time that Plaintiffs used Juul e-cigarettes, Juul Labs committed unfair and deceptive acts and practices, including, but not limited to: (1) breach of the implied warranty of merchantability by manufacturing, selling, and/or distributing Juul e-cigarettes in a defective condition unreasonably dangerous to minors and (2) unfairly designing and marketing its e-cigarettes for use by minors.

4.  Plaintiffs seek injunctive relief from the wrongful conduct alleged in this Complaint, which proximately caused them and Class Members to become regular users of Juul e-cigarettes.

*The Parties*

5.  Plaintiff Matthew Murphy is a resident of Reading, Massachusetts. Mr. Murphy became addicted to Juul e-cigarettes while living in Reading.

6.  Plaintiff Cade Beauparlant is a resident of Newburyport, Massachusetts. Mr. Beauparlant became addicted to Juul e-cigarettes while living in Newburyport.

7.  Plaintiff Marianne Savage is a resident of Bolton, Massachusetts. Her son, M., became addicted to Juul e-cigarettes while living in Bolton.

8.  Plaintiffs assert these claims on behalf of a class (the "Class") of all similarly situated persons in Massachusetts who became regular users of Juul e-cigarettes before the

age of 18, and the parents and legal guardians of such persons. The proposed Class does not include persons who were regular users of conventional cigarettes prior to using Juul e-cigarettes.

9. Defendant Juul Labs, Inc. is a California corporation that conducts business in the Commonwealth of Massachusetts. Juul Labs (and its predecessor corporations PAX Labs, Inc. and Ploom, Inc.) designs, manufactures, markets, distributes, and sells e-cigarettes throughout the United States, including in the Commonwealth of Massachusetts.

*Jurisdiction and Venue*

10. Defendant has done and continues to do business in the Commonwealth of Massachusetts; made contracts to be performed in whole or in part in the Commonwealth; and/or manufactured, tested, sold, offered for sale, supplied e-cigarettes, or placed cigarettes in the stream of commerce, or in the course of business, materially participated with others in so doing; and performed such acts as were intended to and did result in the sale and distribution in the Commonwealth of e-cigarette devices, their components, including but not limited to JUULpods ("pods"), and related products from which the Defendant derived substantial revenue, directly or indirectly.

11. Defendant also caused injury by acts or omissions in the Commonwealth and/or caused injury in the Commonwealth by acts or omissions outside the Commonwealth.

12. This Court has diversity jurisdiction over this case under 28 U.S.C. § 1332 because Plaintiffs and Defendant are citizens of different states and the amount in controversy exceeds $75,000.

*Class Allegations*

13. Matthew Murphy was born in 1999 and resides in Reading, Massachusetts. Mr. Murphy tried his first Juul e-cigarette at the age of 17. Shortly after trying his first Juul e-cigarette, Mr. Murphy became a regular and daily user of Juul e-cigarettes, using one or more Juul "pods" (pre-filled nicotine and flavor cartridges needed to operate a Juul e-cigarette) per day. Mr. Murphy became heavily addicted to nicotine through his use of Juul e-cigarettes and felt a need to use Juul e-cigarettes throughout the day. Mr. Murphy began to experience irritability and aggression as a result of his craving for the product and the high levels of nicotine it delivers. Mr. Murphy's near constant desire to use Juul e-cigarettes disrupted his ability to perform effectively in academic and athletic affairs. Mr. Murphy attempted to quit "Juuling" many times, but would experience severe discomfort each time and would quickly resume using the product. After many quit attempts, Mr. Murphy was finally able to quit using Juul e-cigarettes in June of 2018, roughly two years after he initially became a regular user. Even so, he still craves Juul e-cigarettes when he sees others using them.

14. Cade Beauparlant was born in 2001 and resides in Newburyport, Massachusetts. Mr. Beauparlant was about 16 years old when he began using Juul e-cigarettes. For roughly two years, Mr. Beauparlant used approximately one Juul pod per day, using many of the different flavored nicotine pods sold by Defendant, including "Mint," "Mango," and "Cucumber." Mr. Beauparlant used his Juul e-cigarette many times daily. He regularly used it shortly before he went to sleep and first thing in the morning as well as many times throughout the day. As a high school student, Mr. Beauparlant would regularly leave class to use his Juul surreptitiously in the high school's bathrooms or hallways, finding that he could not sit for the duration of a

class without taking a puff. Mr. Beauparlant's addiction to Juul disrupted his academic and athletic performance, but even after recognizing these impacts and wishing to stop his regular daily use of the product, he found that he was unable to. Beginning in roughly January 2019, Mr. Beauparlant has repeatedly attempted to quit using Juul products in multiple ways, including by seeking the advice of a pediatrician who specializes in youth nicotine cessation, using Nicorette gum, "weaning" himself off Juul, and taking part in counseling sessions. Since January 2019, Mr. Beauparlant has succeeded in cutting back on Juuling, but has found it to be extremely difficult to quit and is still regularly using Juul e-cigarettes.

15. Marianne Savage resides in Bolton, Massachusetts. Ms. Savage brings this suit on behalf of her son, M., a minor who is 16 years old and who began using Juul e-cigarettes at about the age of 15. In October of 2018, Ms. Savage found a number of already consumed "mint" and "menthol" flavored Juul "pods" in M.'s possession. Around the same time, Ms. Savage observed that M. was experiencing severe behavioral changes attributable to his addiction to Juul e-cigarettes. Due to this addiction, M. became increasingly angry, irritable, aggressive and anxious. M.'s regular use of Juul products affected his athletic performance and caused him to experience physical problems, including coughing, nausea, and vomiting. Ms. Savage has sought treatment for her son's symptoms, but has been unable to find health care providers who can help M. quit Juuling.

16. At all times relevant to this Complaint, Juul Labs acted willfully or negligently by designing, manufacturing, distributing, selling, and promoting its products in such a

way that was defective compared to available safer alternative designs, and in a

manner that was designed and marketed to appeal to minors, including the Plaintiffs.

17. As a consequence of Juul Labs' conduct, Plaintiffs have suffered and/or continue to

suffer from increased anxiety stemming from a near-constant desire to use Juul e-

cigarettes.

18. Also as a consequence of Juul Labs' conduct, Plaintiffs have repeatedly purchased

Juul e-cigarettes in order to maintain product use despite a desire to stop using Juul e-

cigarettes regularly and daily.

19. The Class affected by Juul's conduct is estimated to include more than 50,000 minors

in Massachusetts who became daily users of Juul e-cigarettes,[1] as well as their parents

and young adults who are currently the age of majority who became addicted to e-

cigarettes as minors. Due to the size of the Class, joinder of all of its Members would

be impracticable.

20. The determination of this matter will rest on essentially the same determinations of

law and fact as would be the case for any individual Class Member. Since this is not

an action for damages, there is no need for individual determinations of harm, nor are

there available defenses based on comparative fault. The questions of law and fact to

---

[1] It is estimated that 68,398 young people ages 14-17 across Massachusetts used e-cigarettes in the past 30 days. This estimate is based on a population of 328,838 14-17 year olds in Massachusetts (according to the 2017 U.S. Census) and the Centers for Disease Control and Prevention's determination that about 20.8% of high school students nationally have used an e-cigarette in the past 30 days. *See* United States Census Bureau, American FactFinder, *Annual Estimates of the Resident Population for Selected Age Groups by Sex for the United States, States, Counties, and Puerto Rico Commonwealth and Municipos: April 1, 2010 – July 1, 2017* (2017), https://factfinder.census.gov/bkmk/table/1.0/en/PEP/2017/PEPAGESEX; Centers for Disease Control & Prevention, *Youth and Tobacco Use*, https://www.cdc.gov/tobacco/data_statistics/fact_sheets/youth_data/tobacco_use/index.htm(last updated Feb. 18, 2019). According to Nielsen data, Juul is, by far, the most popular e-cigarette brand, accounting for approximately 68% of the U.S. e-cigarette market in 2018, and a higher proportion of the youth e-cigarette market. See Jennifer Maloney, *Juul Raises $650 Million in Funding That Values E-Cig Startup at $15*, WALL STREET JOURNAL (July 10, 2018), https://www.wsj.com/articles/juul-raises-650-million-in-funding-that-values-e-cig-startup-at-15-billion-1531260832.

be determined are limited to the duties that Defendant owed to consumers of its products, whether Defendant's conduct breached any or all of those duties, and what the appropriate measures are for equitable relief, including providing funding for a statewide e-cigarette prevention and cessation program with a focus on developing best practices to assist Class Members to cease use of e-cigarettes and to prevent relapse.

21. The experiences of the Plaintiffs are representative of the experiences of the tens of thousands of Members of the Class who are struggling with their addiction to Juul e-cigarettes and would like access to resources to help them to quit. The claims or defenses presented by these parties will be typical of those which could be brought by any of the Members of the Class.

22. The Plaintiffs are dedicated to the prosecution of this action and have retained counsel with decades of experience in tobacco product liability and public health litigation. The representative parties are therefore adequate representatives of the Class.

23. The Plaintiffs and the Class meet the requirements of numerosity, commonality, typicality, and adequacy set forth in Fed. R. Civ. P. 23(a), and the Defendant has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the Class as a whole, thus satisfying FED. R. CIV. P. 23(b)(2) as well as the requirements of MASS. GEN. LAWS c. 93A.

*Breach of Implied Warranty of Merchantability*

24. Plaintiffs restate and incorporate herein the foregoing paragraphs 1–24 of their Complaint.

25. Defendant breached the implied warranty of merchantability because the Juul e-cigarette products it manufactured, marketed, distributed, and sold are unreasonably dangerous products, which Defendant impliedly warranted were merchantable and fit for the ordinary purposes for which they were intended.

26. Defendant engaged in the business of manufacturing, testing, designing, advertising, marketing, packaging, selling, and/or distributing Juul e-cigarettes, and placing these e-cigarettes into the stream of commerce in Massachusetts.

27. Juul e-cigarettes were expected to, and did, reach Plaintiffs in substantially the same condition they were in when originally manufactured and distributed and sold by Defendant.

28. The Juul e-cigarettes manufactured, sold, and distributed by Defendant to Plaintiffs were defective and unreasonably dangerous for reasons including, but not limited to:

   a. Despite Juul's claims of creating a product for adult smokers seeking to switch from conventional cigarettes, Juul designed its e-cigarettes to yield a physiological response and degree of "satisfaction" exceeding those of even traditional cigarettes.

   b. Juul designed, engineered, patented, and manufactured its e-cigarettes and proprietary vapor liquid to contain a proprietary blend of nicotine salts ("JUULSalts"), which facilitate the delivery of very high concentrations of the addictive chemical, nicotine, while simultaneously mitigating adverse taste and irritation and maintaining palatability, making Juul e-cigarettes particularly attractive and accessible to minors who have never smoked a single conventional

cigarette.[2] In its design of JUULSalts, Juul knowingly adopted and further perfected methods pioneered by the tobacco industry in order to promote inhalation, reduce throat irritation, and produce the desired nicotine "kick."[3] Juul e-cigarettes are designed to allow for previously unpalatable concentrations of nicotine to be inhaled by teens who are naturally sensitive to nicotine, with negligible irritation or discomfort.[4] This design circumvents teens' natural defense mechanisms, thereby facilitating exposure to levels of nicotine that rapidly leads to early and significant nicotine dependence and addiction in adolescents.[5]

c.  Many of the design elements that encourage initiation and continued regular use (*e.g.*, the blending of nicotine salts to increase inhalability and reduce irritation) also increase the abuse liability (*i.e.*, risk for addiction) for teen use of Juul products. Juul has designed its product to eliminate sensory feedback, the body's natural defensive response that would otherwise occur with such a large dose of nicotine, but for the use of JUULSalts and the design of the electronic delivery system. By doing so, Juul's design fundamentally and deceptively impairs the ability of Class Members to identify that they are inhaling something that they

---

[2] See Truth Initiative, *Behind the Explosive Growth of Juul: Social Influences and Flavors Drive Rising Teen Use of the Top E-cigarette* (Dec. 2018), https://truthinitiative.org/sites/default/files/media/files/2019/03/Behind-the-explosive-growth-of-JUUL.pdf.

[3] In U.S. patent No. 9,215,895, Pax Labs, Inc., a predecessor to Juul Labs, describes its process for combining nicotine with benzoic acids to produce nicotine salts (JUULSalts), a formulation that is based on a nicotine salt additive that R.J. Reynolds Tobacco Company developed decades earlier. *See* U.S. Patent No. 9,215,895 (filed Dec. 22, 2015).

[4] See Jessica L. Barrington-Trimis & Adam M. Leventhal, *Adolescents' Use Of "Pod Mod" E-Cigarettes - Urgent Concerns,* 379(12) N. ENGL. J. MED. 1099 (2018).

[5] See Maciej Lukasz Goniewicz et al, *High Exposure To Nicotine Among Adolescents Who Use Juul And Other Vape Pod Systems ('Pods'),* TOBACCO CONTROL (Sept. 2018), https://tobaccocontrol.bmj.com/content/early/2018/08/30/tobaccocontrol-2018-054565.

would not otherwise inhale, fostering and further facilitating initiation of
unwanted regular daily product use.

d.   Juul designed, engineered, patented, and manufactured its products to contain
especially high concentrations of nicotine, touting a "5% concentration" that is
still palatable to such a degree that young users report being able to titrate dosage
to achieve a "buzz" without irritation.[6] This 5% concentration of nicotine is
approximately three times the maximum nicotine concentration level permitted to
be used in e-cigarettes sold in the European Union.[7] Yet recent research
demonstrates that the extremely high nicotine concentration reported by Juul and
listed on product packaging is, in actuality, likely higher. In one study, researchers
found that JUULpods contained a concentration of 6.2% nicotine salt, rather than
5% nicotine as advertised – a relative increase of more than 20%.[8] Other studies
have reported even higher actual concentrations of nicotine in JUULpods.[9]
Coupled with more benzoic acid to increase inhalability (as described in ¶ 44),
Juul e-cigarettes used by Class Members (or their minor children) deliver an
absolute concentration of – and form of – nicotine that is unreasonably dangerous,
especially to young consumers.

e.   Juul designed the nicotine salt formation of the JUULSalts used in its e-cigarettes
to yield a physiological response exceeding those of conventional cigarettes,

---

[6] See Emma I. Brett et al., *A Content Analysis of Juul Discussions on Social Media: Using Reddit to Understand Patterns and Perceptions of Juul Use*, 194 DRUG & ALCOHOL DEPENDENCE 358, 360 (2019).
[7] See European Parliament and the Council of 3 April 2014, *Directive 2014/40/EU*, Section 38. J. OF THE EUR. UNION (2014), https://ec.europa.eu/health//sites/health/files/tobacco/docs/dir_201440_en.pdf.
[8] James F. Pankow et al., *Benzene Formation in Electronic Cigarettes*, 12.3 PLOS ONE e0173055 (2017), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0173055
[9] See, e.g., Samantha M. Reilly et al., *Free Radical, Carbonyl, and Nicotine Levels Produced by JUUL Electronic Cigarettes*, NICOTINE & TOBACCO RES. (2018), https://academic.oup.com/ntr/advance-article/doi/10.1093/ntr/nty221/5139734

thereby increasing the potential for addiction and other adverse health effects as compared to traditional cigarettes.[10] Juul e-cigarettes deliver levels of nicotine higher than that of conventional cigarettes.[11] Research has shown that a puff from a Juul will contain a third more nicotine than a puff from the leading conventional cigarette, Marlboro.[12] These design features contribute to the dosage and rate of administration of nicotine from Juul e-cigarettes exceeding those of conventional cigarettes.

f.   The design of the Juul e-cigarette system including the disposable pods ("JUULPods") containing the nicotine solution and the electronics that aerosolize and administer the drug have a fundamental impact on the dosage of nicotine and titration of the dosage. Juul's design controls the temperature, the duration of a puff, the airflow of the puff, and, obviously, the content of the pods to precisely determine the amount of nicotine that the product delivers to users. In one patent application, Juul e-cigarette designers describe such control over dosage: "A device that is part of a vaporizer system as defined above can be used for any of one or more functions, such as controlling dosing (*e.g.* dose monitoring, dose setting, dose limiting, user tracking, etc.), . . ."[13] In contrast to a conventional

---

[10] See U.S. Patent 9,215,895 (filed Dec. 22, 2015). The patent's description states that "certain nicotine salt formulations provide satisfaction in an individual superior to that of free base nicotine, and more comparable to the satisfaction in an individual smoking a traditional cigarette. The satisfaction effect is consistent with an efficient transfer of nicotine to the lungs of an individual and a rapid rise of nicotine absorption in the plasma. . . . [T]he peak concentration of the nicotine in the blood and total amount of nicotine delivered [from nicotine salt formulations] appears comparable to a traditional cigarette. . . . Nicotine from a nicotine salts formulation appears to generate a heartbeat that is nearly 1.2 times that of a normal heart rate for an individual approximately 40 seconds after the commencement of puffing; whereas the nicotine from a nicotine freebase formulation appears to generate a heartbeat that is nearly 1.2 times that of a normal heart rate for an individual approximately 110 seconds after the commencement of puffing. Id. at col. 7-8, 24.

[11] See Reilly et al., *supra* note 9.

[12] See id.

[13] U.S. Patent Application No. 15/827,159 (filed 2017), Publication No. 2018/0093054 Al (published April 5, 2018).

11

cigarette, which will self-extinguish as the cigarette is consumed, Juul devices
contain no "off" switch, allowing for and encouraging nonstop nicotine
consumption only limited by the device's rechargeable battery capacity. In
contrast to a cigarette smoker who needs to individually light 20 cigarettes with a
match or lighter to initiate combustion in order to consume a pack, a Juul user can
puff frequently and almost continuously from the device until it needs to be
recharged. This design programs the brain to require frequent dosing in a way that
conventional cigarettes do not.

g.   Juul also designed, engineered, patented, and manufactured its vapor liquids to
contain chemical flavorings, which have been found to serve as a primary reason
for youth initiation of e-cigarette use. Sweet flavors (including "Mango," "Fruit
Medley," "Crème Brulee," and "Cucumber"), as well as its menthol-derived
flavors ("mint," "cool mint," and "classic menthol"), cater to the preferences of
non-smoking minors, whose palates are innately averse to the harsh, bitter taste of
unflavored nicotine products and whose brains are particularly susceptible to the
appeal of sweet tastes.[14] These flavors allow for the initiation of e-cigarette use
among minors, as well as rapid, continuous use of e-cigarettes, leading to
unwanted regular and daily use of these Juul e-cigarettes.[15] In one national
survey, more than 80 percent of youth e-cigarette users said they used e-cigarettes

---

[14] See, e.g., Melissa B. Harrell et al., *Flavored E-cigarette Use: Characterizing Youth, Young Adult, and Adult Users*, 5 PREVENTIVE MED. REP. 33 (2017); Suchitra Krishnan-Sarin et al., *Studying the Interactive Effects of Menthol and Nicotine Among Youth: An Examination Using E-cigarette*, 180 DRUG & ALCOHOL DEPENDENCE 193 (2017); Meghan E. Morean et al., *Preferring More E-Cigarette Flavors Is Associated With E-Cigarette Use Frequency Among Adolescents But Not Adults*, 13(1) PLOS ONE  e0189015 (2018), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0189015.
[15] See Erin L. Mead et al., *E-Cigarette Palatability in Smokers as a Function of Flavorings, Nicotine Content and Propylthiouracil (PROP) Taster phenotype*, 91 ADDICT. BEHAV. 37 (2019).

"because they come in flavors I like," and the vast majority reported that they used a flavored e-cigarette product the first time that they tried vaping.[16]

h. Juul designed, engineered, patented, and manufactured its e-cigarettes effectively to deliver concentrations of nicotine with an unreasonably high abuse liability that would foreseeably lead to unwanted regular and daily product use by Class Members. Decades of medical research have demonstrated that adolescents are particularly vulnerable to nicotine addiction.[17] Nicotine can permanently alter children's and adolescents' brain chemistry, with long-term impacts on young people's physical and mental health.[18]

i. Juul e-cigarettes have such a high abuse liability for teens that the increase in adolescent vaping in one year alone corresponded to the "largest ever recorded [increase] . . . for any adolescent substance use outcome in the U.S."[19] Thus, since coming into the market in 2015, Juul has reversed nearly two decades of reduction in teenage nicotine addiction, increasing the prevalence of teenage nicotine use to

---

[16] See Bridget K. Ambrose et al., *Flavored Tobacco Product Use Among US Youth Aged 12-17 Years, 2013-2014*, 314(17) JAMA 1871 (2015); see also Karma McKelvey et al., *Adolescents' and Young Adults' Use and Perceptions of Pod-Based Electronic Cigarettes*, 1.6 JAMA NETWORK OPEN e183535 (2018).

[17] See, e.g., Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 NEUROPSYCHIATRIC DISEASE & TREATMENT 449 (2013).

[18] See Natalia A. Goriounova & Huibert D. Mansvelder, *Short- and Long-Term Consequences of Nicotine Exposure during Adolescence for Prefrontal Cortex Neuronal Network Function*, 2(12) COLD SPRING HARBOR PERSPECTIVES IN MED. a012120 (2012), http://perspectivesinmedicine.cshlp.org/content/2/12/a012120.full; Menglu Yuan et al., *Nicotine and the Adolescent Brain*, 593(16) J. PHYSIOL. 3397 (2015); Yael Abreu-Villaça et al., *Nicotine Is A Neurotoxin In The Adolescent Brain: Critical Periods, Patterns Of Exposure, Regional Selectivity, And Dose Thresholds For Macromolecular Alterations*, 979(1-2) BRAIN RES. 114 (2003); Danielle S. Counotte et al., *Development Of The Motivational System During Adolescence, And Its Sensitivity To Disruption By Nicotine*, 1(4) DEV. COGNITIVE NEUROSCIENCE 430 (2011). See also Surgeon General of the United States, *Know the Risks: E-cigarettes & Young People*, https://e-cigarettes.surgeongeneral.gov/knowtherisks.htm; Erin Brodwin, *Experts Are Calling Out A Vape Pen With 'Scary' Nicotine Levels That Teens Love — Here's How It Affects The Brain*, BUSINESS INSIDER, (Apr. 19, 2018) (citing Francesco Musso et al., *Smoking Impacts On Prefrontal Attentional Network Function In Young Adult Brains*, 191(1) PSYCHOPHARMACOLOGY 159 (2007).

[19] Richard Miech et al., *Adolescent Vaping And Nicotine Use In 2017–2018 — U.S. National Estimates*, 380(2) N. ENGL. J. MED. 192 (2019) (emphasis added).

levels not seen since the early 2000s.[20] Because of Juul's conduct, youth nicotine addiction is once again an epidemic and has had a profound impact on Plaintiffs.

j. There is strong emerging evidence that the Juul's high abuse liability for youth may result in minors' subsequent initiation of smoking conventional cigarettes[21] or that minors who regularly use Juul e-cigarettes may be more likely to use other substances of abuse.[22] Adolescent addiction to nicotine through Juuling permanently increases risk for other addictions. Class Members who first became regularly exposed to nicotine through Juul e-cigarettes, face increased health risks as a consequence, including those associated with conventional cigarette use, and therefore desire opportunities to effectively treat the resulting dependence.

29. Juul's e-cigarettes were intentionally designed to deliver very high doses of nicotine with each puff. When Juul was introduced to the market in 2015, most nicotine solutions for e-cigarettes were in the 1-2% concentration range, with 3% as the upper limit offered for already heavily addicted smokers.[23] Each "pod" used to operate a Juul device (and sold by Defendant) delivers to the user as much nicotine as one or two packs of cigarettes. The defective and dangerous nature of Juul's e-cigarettes, along with deceptive and misleading marketing and advertising strategies, results in

---

[20] See Centers For Disease Control and Prevention, *Surgeon General's Advisory on E-Cigarette Use Among Youth. U.S. Centers for Disease Control and Prevention* (Apr. 9, 2019), https://www.cdc.gov/tobacco/basic_information/e-cigarettes/surgeon-general-advisory/index.html.

[21] See Brian A. Primack et al., *Initiation of Traditional Cigarette Smoking after Electronic Cigarette Use Among Tobacco-Naïve US Young Adults*, 131(4) AM J. MED. 443.e1 (2019).

[22] See, e.g., Eric R. Kandel & Denise B. Kandel, *A Molecular Basis for Nicotine as a Gateway Drug*. 371 NEW ENG. J. MED. 932 (2014).

[23] Robert K. Jackler & Divya Ramamurthi, *Nicotine Arms Race: JUUL And The High-Nicotine Product Market*, TOBACCO CONTROL (Feb. 6, 2019), https://tobaccocontrol.bmj.com/content/early/2019/01/31/tobaccocontrol-2018-054796.full.

an intentionally designed product that would foreseeably be used by persons under the age of 18 and that many of those users would become nicotine dependent. .

30. Juul knew or, by the exercise of reasonable care, should have known that Juul's products under ordinary use were harmful or injurious, particularly to young people, including Class Members. Nicotine has long been shown to be harmful to minors, altering brain chemistry and causing addiction. Nevertheless, as described herein, Juul designed and manufactured its products to deliver extremely high levels of nicotine and optimized its products through engineering for use by minors, blatantly ignoring evidence of the harmful impact that nicotine has on population health. Juul additionally encouraged young people to buy and use its products, by methods such as designing fruit, mint, and candy-flavored JUULpods, reducing the irritability of its nicotine delivery system, and by designing sleek devices that appeal to tech-savvy youth.

31. Juul has become the e-cigarette industry leader, dominating the e-cigarette market and expanding the size of the e-cigarette market by cultivating a vast number of users who are under the age of 18. In fact, 15-17 year-olds have more than 16 times greater odds of reporting current use of Juul than do 18-24 year-olds[24] In 2018, the nation's leading tobacco company Altria (parent of Philip Morris) acquired a 35% stake in Juul for $12.8 billion, giving Juul a valuation of $35 billion and providing Altria with potential special access to market to a new generation of non-smoking consumers whom Juul has groomed and captured.

---

[24] Donna M. Vallone et al., *Prevalence And Correlates Of JUUL Use Among A National Sample Of Youth And Young Adults*, TOBACCO CONTROL (2018), https://tobaccocontrol.bmj.com/content/early/2018/10/30/tobaccocontrol-2018-054693.full.

32. Juul, through the sale and marketing of Juul products, impliedly warranted that Juul e-cigarettes were fit for their intended purposes.

33. At all times relevant to this Complaint, Class Members used the e-cigarettes manufactured, sold, and distributed by Juul in substantially the same manner in which Juul intended and expected such e-cigarettes to be used.

34. As a proximate result of Juul Labs' breach of warranty, Class Members have suffered injury, including, but not limited to, addiction to nicotine and the risk of the physiological and psychological harms associated with unwanted daily use of Juul e-cigarettes.

35. Juul marketed a dangerous product that never should have been sold to the Plaintiffs and the Class when, even for age appropriate users, there were available safer alternatives, e.g., such as e-cigarette products that already existed on the market that were not designed to maximize inhalation of high doses of nicotine and minimize irritation, ergo, not designed to create addiction.

*Marketing to Minors*

36. Plaintiffs restate and incorporate herein the foregoing paragraphs 1–35 of their Complaint.

37. Juul owed Class Members a duty to exercise reasonable care in the design, development, marketing, promotion, packaging, sale, and/or distribution of Juul e-cigarettes.

38. Juul failed to exercise reasonable care in the design and development of its products, and in the marketing and promotion of its products to minors.

39. Juul willfully and purposefully designed products specifically to appeal to minors as consumers, including by designing its e-cigarettes in such a way as to entice non-smoking minors to begin using its products and to facilitate ease of use by minors once nicotine addiction is established. These design features include but are not limited to: the design of the delivery device made to promote surreptitious consumption, which particularly appeals to the use of e-cigarettes by prohibited consumers such as minors; and the use of flavored vapor liquids which cater to the tastes of minors and allows for deeper inhalation of the product.

40. Juul breached the duty of care it owed to minors in its design of Juul e-cigarettes, including, but not limited to, the following breaches:

   a. Juul designed its e-cigarettes to be compact, sleek, and high tech – a design that appeals to tech-savvy minors and makes the product appear to young audiences like a harmless, fun accessory.[25] For example, each Juul device's aluminum shell contains small lights that not only indicate battery power and product delivery when puffing, but also contains a hidden element in the design known by video game players as an "Easter Egg." This is an undocumented special feature designed for social use whereby after the user takes a puff, she can quickly wave the device around to create a rainbow of flashing colors.[26] A "cool" hidden feature such as "party mode" would foreseeably appeal particularly to adolescent consumers.

---

[25] Ramakanth Kavuluru et al., *On the Popularity of the USB Flash Drive-Shaped Electronic Cigarette Juul*, 28(1) TOBACCO CONTROL 110 (2019).
[26] John Hos, *Getting Your Juul Into Party Mode*, VAPE DRIVE (July 12, 2018), https://vapedrive.com/getting-your-juul-into-party-mode/

b. As described in ¶ 28, Juul designed its vapor liquids to appeal to the preferences of non-smoking minors, including by reducing any harsh flavors inherent to nicotine solutions that may be unappealing to non-smokers and by intentionally adding sweet flavors (such as "Mango," "Fruit," and "Crème Brulee") that appeal to youth. These flavors enhance and encourage youth initiation of e-cigarette use, with the overwhelming majority of young users reporting that their first use of an e-cigarette was with a flavored product.[27]

c. Flavors not only facilitate youth initiation by appealing to children's innate attraction to sweets, but flavors such as "mint" also use menthol, a drug that produces a cooling and numbing effect that allows for deeper inhalation[28] and encourages continued use of e-cigarettes by minors, when compared with unflavored or tobacco-flavored e-cigarette products.[29] Mint and menthol flavoring has been used to enhance the palatability of tobacco products, such as Newport and Salem cigarettes, for decades as a means to facilitate initiation. Chemically, Juul uses menthol as one means to engineer its pods to increase palatability by suppressing the cough reflex that nicotine naïve users would normally experience when administered a very high dose of nicotine such as that found in Juul. This is similar to the use of menthol in cough suppressants on the market such as Halls, Ricola, Cēpacol, as well as the topical cough suppressant, Vicks VapoRub. Although established smokers have already developed a tolerance for inhaling nicotine, this manipulation deliberately enables non-smokers to begin using Juul

---

[27] See Harrell et al., *supra* note 14.
[28] See Krishnan-Sarin et al., *supra* note 14.
[29] See Morean et al., *supra* note 14.

e-cigarettes without the harshness or irritation otherwise associated with inhaling such a large dose of nicotine.

d.  Sweet flavors such as Juul's "Mango" and "Crème Brulee" rely on the efficacy of sucrose as an analgesic which is effective for youth but, interestingly, not adults. Research has shown that children experience a latency to perception of pain and greater pain tolerance when exposed to sweet tastes, a phenomenon that does not seem to apply to adults.[30] As with "Mint," sweet flavors increase palatability, especially for underage nicotine naïve users of Juul e-cigarettes.

e.  Juul designed the physical structure of its e-cigarettes to encourage minors' continued use, thereby facilitating the process whereby minors and Class Members become regular users who are nicotine-dependent. For instance, the compact and concealable design of Juul e-cigarettes may be mistaken for a USB drive, enabling minors to carry and use the product discreetly. (See Figure 1: Juul vs. USB Drive). This discreet design allows for use in schools and dormitories, at home, and in other spaces where smoking and/or vaping may be prohibited. With this ability for discreet use comes the propensity for continuous – and thus generally increased – use of Juul e-cigarettes, as the product can be used

---

[30] Yanina M. Pepino & Julie A. Mennella, *Sucrose-Induced Analgesia Is Related To Sweet Preferences In Children But Not Adults*, 119(1-3) PAIN, 210 (2005).

inconspicuously in a wide variety of settings, including those where teachers, parents, and other adults may disapprove of use.



Figure 1
Juul Device (left) vs. Samsung DUO USB Drive (right)

    f.   Despite Juul's current assertions that it designed and marketed a cessation device (despite never preparing or submitting an application with the U.S. Food and Drug Administration ("FDA") for either a therapeutic or modified risk tobacco product approval), the evidence demonstrates that Juul intended to design and market an attractive and sophisticated product for tech-savvy youth, not a smoking cessation aid. In 2015, one of Juul's research and development engineers made this quite clear when he stated: "We don't think a lot about addiction here because *we're not trying to design a cessation product* at all . . . . [A]nything about health is not on our mind."[31] (emphasis added).

41. Juul promoted its product to appeal to minors as consumers. Juul has used social media marketing campaigns to target teenagers and young adults. These social media advertisements frequently depict young, attractive, and smiling models holding and/or using Juul's e-cigarettes and serve an obvious purpose of attracting youth, including minors, to purchase the products. These marketing activities were maintained from 2015 to 2018.

---

[31] Nitasha Tiku, *Startup behind the Lambo of vaporizers just launched an intelligent e-cigarette*, THE VERGE (Apr. 21, 2015), https://www.theverge.com/2015/4/21/8458629/pax-labs-e-cigarette-juul.

42. When Juul launched its e-cigarette products in June of 2015, it held a launch party to promote its products in New York City. Promotional photographs from the event reveal a number of young looking attendees/invitees using Juul e-cigarettes. (See Figure 2). These Juul users are emblematic of the youth market that the company was seeking to entice when the product became available.





Figure 2
Juul Launch Party, June 2015

43. Juul also breached the duty of care it owed to minors in its marketing and distribution of Juul e-cigarettes, including, but not limited to, the following breaches:

    a.   Since its products launched in 2015, Juul has used social media marketing campaigns to target teenagers and young adults, despite its more recent claim that its products are designed to be used by cigarette smokers seeking to switch from conventional cigarettes. These social media advertisements frequently depicted young, attractive, and smiling models holding and/or using Juul e-cigarettes, and serve the obvious purpose of attracting young people, including minors, to purchase Juul products.[32] As Juul's chief marketing officer, Richard Mumby explained in an interview: in contrast to other marketing campaigns that may be "overtly reliant on just the product," Juul's marketing features 20- and 30-somethings using the product while dressed for a night out – a design that Juul hoped would have a "dynamic energy."[33] Juul's marketing communicated to young people that using Juul e-cigarettes is fun, sleek, and stylish – a "status symbol" – while failing to disclose the nature or risks of using Juul products.

    b.   In 2015, Juul marketed the release of its product with the "Vaporized" campaign – a campaign that employed young, models posing with the Juul e-cigarette. "Smoking Evolved," was a phrase that implied a safer alternative to smoking that would be likely to appeal to young non-smokers, including Class members. (See Figure 3).

---

[32] See Jidong Huang, et al., *Vaping Versus JUULing: How the Extraordinary Growth and Marketing of JUUL Transformed the U.S. Retail E-cigarette Market*, 28(2) TOBACCO CONTROL 146 (2019); Kar-Hai Chu et al., *JUUL: Spreading Online and Offline*, 63(5) J. ADOLESCENT HEALTH 582 (2018).

[33] Declan Harty, *Juul Hopes To Reinvent E-Cigarette Ads With 'Vaporized' Campaign*, AD AGE (June 23, 2015), https://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads-campaign/299112.



Figure 3
Juul "Vaporized" Campaign

   c.   The campaign included, among other elements, substantial social media pushes (accounting for 74% of all e-cigarette smartphone advertising that year), a billboard in Times Square, a prominent spread in *Vice* magazine, and a series of pop-up "JUUL bars" in Los Angeles, New York, and the Hamptons – activities that would have been prohibited by law for a conventional cigarette company.[34] The marketing consultant that Juul used for the "Vaporized" campaign, Cult Collective, explained: "We created ridiculous enthusiasm for the hashtag 'Vaporized,' and deployed rich experiential activations and a brand sponsorship strategy that aligned perfectly with those we knew would be *our best customers*."[35] (emphasis added).

   d.   Juul additionally emphasized the tech-savvy and sleek design of its products in its marketing, capturing the look and feel of Apple, Google, Samsung, and other tech

---

[34] Robert K. Jackler et al., *JUUL Advertising Over its First Three Years on the Market*, Stanford Research Into the Impact of Tobacco Advertising, Stanford University School of Medicine (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.

[35] Cult Ideas, *Juul: Launching A New Product To A Competitive Category*, https://web.archive.org/web/20180828001349/http://cultideas.com/case-study/juul) (accessed Aug. 13, 2019).

giants. Juul even featured language directly comparing its device to Apple's iPhone, stating on its website (quoting a review) that Juul is "the iPhone of e-cigarettes."

e.  Juul has also emphasized its flavored pods in marketing campaigns, a move that directly appeals to the youth market. When youth see e-cigarette ads that emphasize flavors, they believe that the advertisements and products are intended for them. Juul equated its "Crème Brulee" flavored pods to dessert by using the advertising tag line "save room for Juul" and "indulge in dessert without the spoon."[36]

f.  On social media, Juul has used both paid social media "influencers" and celebrities to promote its products, while also using what is known as "hashtag marketing" campaigns to encourage social media users to generate content that amplifies Juul's marketing efforts. Through each of these strategies, Juul has been able to create a viral marketing campaign that reaches young people and has become self-sustaining, advertising Juul products without Juul itself posting on social media. In 2017, there was a significant increase in Juul-related tweets using the Twitter platform, and Juul managed to generate over 300,000 social media posts that featured the hashtag, "#JUUL."[37] Although Juul ceased marketing on social media platforms in 2018, the "#JUUL" branded hashtag continues to spread and is used by young Juul users across popular social media platforms.

---

[36] See Karma McKelvey et al., *Youth Say Ads For Flavored E-Liquids Are For Them*, ADDICT. 91 BEHAV. 164 (2019).
[37] Jackler, *supra* note 34, at 23.

g.  By marketing its products as an "alternative" to cigarettes, Juul created a perception that its products are less addictive and less dangerous than cigarettes and other tobacco products.  While such marketing implied a low-risk product, Juul failed to disclose to its potential consumers the uniquely addictive impact of Juul's proprietary vaporizer and high concentration nicotine salts, as well as the health effects that product use could have for young people's lung, heart, and brain health.[38]

h.  In 2018, the FDA voiced statements of concern by regarding rising rates of youth addiction to Juul e-cigarettes, effectively forcing Juul to change its marketing strategies, at which point Juul shut down its social media accounts and largely abandoned its use of eye-catching graphics of young, glamorous models for more neutral photos of older models (including, in some cases, users' ages in the advertisements). It was only after being repeatedly threatened with further regulation by the FDA, however, that Juul changed it marketing campaigns to actually focus on adult smokers switching from traditional cigarettes (*e.g.*, "the SWITCH campaign") and began to use older models and less enticing graphics in its marketing. Regardless of these recent changes, Juul's actions have left an epidemic of youth vaping in its wake that must be addressed.[39]

i.  Juul's attempts to distance itself from its wrongful conduct are merely superficial. Juul has not fundamentally changed the design of its products, which are still highly addictive and engineered and distributed in such a way as to appeal to and

---

[38] See Esther E. Omaiye et al., *Toxicity of JUUL Fluids and Aerosols Correlates Strongly with Nicotine and Some Flavor Chemical Concentrations*, BIORXIV (Dec. 2018), available at: https://www.biorxiv.org/content/biorxiv/early/2018/12/09/490607.full.pdf.
[39] See *Surgeon General's Advisory on E-Cigarette Use Among Youth*, *supra* note 20.

to addict young, non-smokers. Juul's business model remains the same despite its recent public relations campaign. This campaign has no impact on Class Members, who are still struggling with nicotine dependence brought on by Juul use as minors.

j.  Although Juul currently markets its product as a smoking cessation device, it has not received FDA approval to market it as a modified risk tobacco product or as a nicotine replacement therapy. This practice falsely reassures Class Members, with the fraudulent notion that the product is safe.[40]

44. Juul's founders and current leaders learned directly from decades of tobacco industry research about how to manipulate nicotine to maximize addiction and how to market tobacco products to youth – the population that the tobacco industry regarded as the "base" of its business[41] and famously courted as "replacement smokers."[42] In fact, Juul's founders have indicated that they had accessed many of the thousands of tobacco industry documents that were made public in the 1990s, using these documents (and knowledge of subsequent regulation of the industry) to craft a blueprint for Juul's success. As one of Juul's co-founders admitted in an interview, "It became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries. And we were able to catch up . . . to a huge, huge industry in no time. And then we started

---

[40] The U.S. Court of Appeals for the D.C. Circuit ruled that the FDA must approve e-cigarettes when they are "therapeutically marketed," since then such products would fall under the jurisdiction of the drug/device provisions of the Federal Food, Drug, and Cosmetic Act (FDCA). See Sottera Inc. v. Food and Drug Administration, 627 F. 3d 891 (U.S. App. DC 2010).
[41] Achey TL, Lorillard, *Product Information*, RJ Reynolds Records (Aug. 30, 1978), https://www.industrydocuments.ucsf.edu/docs/hrpk0094.
[42] Unknown. *Younger Adult Smokers: Strategies and Opportunities*, Marketing to Minorities, Military, and Gays MSA Collection (Feb. 29, 1984), https://www.industrydocuments.ucsf.edu/docs/rkvk0045.

building prototypes."[43] Like the tobacco industry before it, Juul recreated the  tobacco industry's well-honed methods to seduce new underage users, using a combination of flavors, nicotine manipulation, and sophisticated marketing to exploit the psychological vulnerabilities of adolescents and addict a new generation to grow its market. In July, 2019 Congressional testimony, that same co-founder sought to explain that he and his colleague actually had pored through the Stanford University archive of tobacco industry advertising "to familiarize ourselves with how not to run a business."[44] Yet Juul advertisements and package designs bore such a remarkable similarity to those used by cigarette manufactures that Philip Morris International legally challenged the similarity of the original Juul logo to the famous Marlboro logo. (See Figure 4).



Figure 4:
Similarities between Marlboro and Juul Designs[45]

---

[43] Gabriel Montoya, *Pax Labs: Origins with James Monsees*, Social Underground (Jan. 2015) https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/.
[44] Testimony of James Monsees Before the House Committee on Oversight and Reforms Subcommittee on Economic and Consumer Policy's Hearing, *Examining JUUL's Role in the Youth Nicotine Epidemic: Part II*, YouTube (July 25, 2019), https://youtu.be/xetCY0jEPAs?t=5460, Timestamp 1:31.
[45] Robert K. Jackler, *The Role Of The Company In The JUUL Teen Epidemic: Testimony For House Subcommittee On Economic And Consumer Policy:* Testimony for House Subcommittee on Economic and Consumer Policy (July

45. In addition to tobacco industry advertising, Juul's co-founders researched historical cigarette company patents. These patents provided Juul with approaches to manipulate the pH of its nicotine solution to reduce irritation caused by inhalation while maximizing nicotine delivery to the user. By using benzoic acids to lower the solution's pH to less than 6.0, Juul's vapor liquid reduces the irritation and cough reflex that users would otherwise experience when vaping such a high nicotine solution and reduces the freebase nicotine delivery that previous designs of e-cigarettes used. This new design, nicotine salts, made it easier for non-smokers to initiate and continue vaping with Juul products without experiencing negative side effects such as coughing and throat or lung irritation.[46] This ability to deliver high doses of nicotine that were never before possible without severe irritation is what sets Juul apart from all prior e-cigarette designs and what gives the product its high abuse liability, particularly for Class Members.

46. Through these numerous design elements, Juul engineered its product for non-smokers who were not already tolerant of the nicotine inhalation discomfort to which addicted cigarette smokers are already acclimated, thus encouraging initiation, dependence, and addiction.

47. James Monsees, one of the co-founders of Juul, does not hide the ways in which Juul has derived inspiration from the tobacco industry. He has described conventional cigarettes as "the most successful consumer product of all time . . . an amazing

---

24, 2019), https://docs.house.gov/meetings/GO/GO05/20190724/109844/HHRG-116-GO05-Wstate-JacklerR-20190724.pdf.
[46] See J.H. Lauterbach, *One More Time: Unprotonated Nicotine in E-Cigarette Aerosols: Is It Really There?*, TOBACCO SCIENCE RESEARCH CONFERENCE (2018), https://www.coresta.org/sites/default/files/abstracts/2018_TSRC83_Lauterbach.pdf; Anna K. Duell et al., *Free-Base Nicotine Determination in Electronic Cigarette Liquids by 1H NMR Spectroscopy*, 31(6) CHEM. RES. TOXICOL. 431, 431 (2018).

product."[47] With a focus on recreating the "ritual and elegance that smoking once exemplified," he and his fellow cofounder set out to capture consumers who were not users of conventional cigarettes.[48]

48. As a proximate result of Juul Labs' deliberate and deceptive design and marketing, Class Members have suffered injury, including, but not limited to, discomfort and cravings as a consequence of using Juul e-cigarettes.

*Violations of MASS. GEN. LAWS ch. 93A, §§ 2, 9*

49. Plaintiffs restate and incorporate herein the foregoing paragraphs 1–48 of their Complaint.

50. Juul Labs has committed unfair and deceptive acts and practices in violation of Massachusetts' Consumer Protection Act, MASS. GEN. LAWS ch. 93A § 2(a) and regulations promulgated thereunder. These violations include, but are not limited to, Defendant's breach of the implied warranty of merchantability, in violation of MASS. GEN. LAWS ch. 93A § 2, by manufacturing, selling and/or distributing Juul e-cigarettes in a defective condition unreasonably dangerous to users and consumers, including Members of the Class, because such e-cigarettes delivered nicotine in a form which induced physiological response and "satisfaction" well in excess of that of a conventional cigarette, when a safer alternative design was available.

51. Defendant also violated Massachusetts' Consumer Protection Act, MASS. GEN. LAWS ch. 93A § 2 by engaging in oppressive or otherwise unconscionable business

---

[47] Montoya, *supra* note 43.
[48] Shanelle Mullin, *Start Your Own Revolution: An Interview with James Monsees*, ONBOARDLY (Apr. 30, 2014), https://web.archive.org/web/20161108110231/http://onboardly.com/entrepreneur-interviews/an-interview-with-james-monsees.

practices, including and especially designing and marketing its products to appeal to minors as consumers.

52. Plaintiffs are entitled to bring this action as a class under MASS. GEN. LAWS ch. 93A § 9, as Juul's unfair and deceptive acts or practices caused similar injury to Plaintiffs and others similarly situated across the Commonwealth of Massachusetts.

53. By letter dated April 29, 2019, Plaintiffs sent a demand for relief to Defendant Juul Labs, in accordance with MASS. GEN. LAWS ch. 93A § 9(3). Defendant did not respond to Plaintiffs' demand for relief by making a written tender of settlement reasonable for the injuries suffered by the Class.

54. As a proximate result of the Defendant's violations of 93A, the Plaintiffs and the Members of the Class have suffered injury, including addiction to nicotine, and are entitled under MASS. GEN. LAWS ch. § 9 to the relief sought in the Complaint.

55. Class Members who are addicted to Juul e-cigarettes struggle to find health care providers who can help them quit Juuling.[49] Even medical providers who specialize in addiction or tobacco cessation report that they are currently ill-equipped to help young people who want to quit the use of Juul products and end their addiction to nicotine.[50]

*Prayer for Relief*

The Plaintiffs and the Class respectfully pray that the Court enter judgment against Defendant:

---

[49] See, e.g., Jan Hoffman, *Addicted to Vaped Nicotine, Teenagers Have No Clear Path to Quitting*, NEW YORK TIMES (Dec. 19, 2018), https://www.nytimes.com/2018/12/18/health/vaping-nicotine-teenagers.html.
[50] Jamie Ducharme, *As Kids Get Hooked on Vaping, Parents Are Desperate for Treatment That Doesn't Exist*, TIME MAGAZINE (Mar. 21, 2019), https://time.com/5549340/vaping-addiction-treatment/.

A. Enjoining Defendant from continuing its unfair and deceptive acts and practices, and mandating that it provide adequate funding to establish an independent statewide clinical treatment and research program in the Commonwealth of Massachusetts for the prevention and treatment of nicotine addiction in young persons who use Juul e-cigarettes.[51]

B. Such an e-cigarette prevention and treatment program would offer medical services including, but not limited to:

1) Age-appropriate individual and group nicotine cessation counseling;

2) Promising behavior therapies and technologies;

3) Intensive nicotine cessation support services; and

4) The provision of nicotine cessation medications.

C. The statewide program would additionally engage in clinical and public health research to evaluate the evidence base on youth e-cigarette use and treatment and to develop and establish best practices for prevention and treatment programs for addiction to e-cigarette-based nicotine.

D. Grant such other and further relief as is just and proper.

Respectfully submitted,

Andrew A. Rainer, BBO #542067
Meredith K. Lever, BBO #691953
Juliana Shulman-Laniel, BBO #704165
Mark A. Gottlieb, BBO #627008

---

[51] Such relief is appropriate in this context, as it was in *Scott v. Am. Tobacco Co.*, 36 So. 3d 1046 (La. Ct. App. 2010), a class action brought against tobacco companies in which the court granted injunctive relief in the form of the establishment of a comprehensive cessation assistance program.

Public Health Advocacy Institute
360 Huntington Avenue, #117CU
Boston, MA 02115
(617) 373-8066
arainer@phaionline.org
meredith@phaionline.org
juliana@phaionline.org
mark@phaionline.org

Dated August 15, 2019